

# NUMBER 13-20-00248-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF M.J., A CHILD

**On appeal from the County Court at Law
of Aransas County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Chief Justice Contreras**

This appeal concerns the termination of parental rights to M.J., a child.[1] Appellants A.K. and K.J., the child's mother and father, argue that the evidence was legally and factually insufficient to support (1) predicate grounds for termination under Texas Family Code § 161.001(b)(1), or (2) a finding that termination is in the best interests of the child.

---

[1] We refer to the children and their family members by their initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

We affirm.

## I. BACKGROUND

Appellee, the Texas Department of Family and Protective Services (the Department), filed its petition seeking termination of both appellants' parental rights on February 7, 2019. The following testimony was elicited at the final termination hearing, held via videoconference on May 7, 2020. The record reflects that both appellants and their attorneys appeared at the hearing.

Ashley Fisher, an investigator with the Department, testified that M.J. was born on July 25, 2017, and that appellants are her biological parents. On January 24, 2019, the Department learned that K.J. had been accused of sexual abuse by C.L., A.K.'s 10-year-old daughter from a prior relationship.[2] Fisher made contact with appellants, who were then living in Rockport at the residence of K.J.'s mother, L.J. The Department implemented a safety plan, which A.K. and L.J. signed, and a copy of the plan was entered into evidence. The plan stated that A.K. "agrees to not reside with [K.J.]"; that A.K. "agree[s] there will be no contact" between M.J. and K.J.; and that L.J. "agrees [K.J.] will not reside at her residence."

A.K. and M.J. continued to live with L.J., while K.J. moved out. Later, around the time C.L. was to be interviewed at the Children's Advocacy Center (CAC), the Department received reports of "domestic violence" occurring in L.J.'s home; specifically, that "[K.J.] was kicking them outside to sleep" and was "throwing objects at mom and the children." According to Fisher, the Department "recommended for another safety plan to be

---

[2] At the time, C.L. was living with her maternal grandmother H.K., and H.K. had an "active case" against A.K. to obtain custody of C.L.

implemented for supervision," but "when [A.K.] could not come up with any support to assist her with that, we recommended the Purple Door," a domestic violence shelter.

A.K. and M.J. moved into the Purple Door and stayed there "temporarily" but moved back in with L.J. on February 5, 2019. As of that date, K.J. had also moved back in with L.J.; Fisher therefore agreed that A.K.'s moving back in with L.J. was a violation of the safety plan. The Department held an "emergency family team meeting" during which A.K. and L.J. both stated they did not believe C.L.'s outcry of abuse. At the conclusion of the meeting, however, police arrived and arrested K.J. for aggravated sexual assault of a child. The Department then sought a "non-emergency removal" of M.J. because A.K. "did not have another residence to live with other than with the alleged perpetrator"; because "she was refusing to return to the shelter and did not believe her oldest child's outcry"; and because she was "being non-protective of [M.J.]." Fisher stated that A.K. did not suggest any relatives or other potential caretakers for M.J. who were qualified or were willing to take the child; her mother did not qualify because she had a "validated CPS history."

On cross-examination, Fisher confirmed that there was no evidence, at the time of M.J.'s removal, indicating that M.J. had been sexually abused. She also conceded that her investigation did not reveal that law enforcement ever responded to any domestic violence concerns at L.J.'s residence.

Fisher testified that the Department "ruled out any concerns for sexual abuse" of M.J. However, she agreed that M.J. is non-verbal and that this is a safety concern because "if something were to occur, she would have an inability to communicate that." Fisher was also concerned because it appeared that A.K. did not have her own home and

3

was "dependent" on L.J. for shelter; moreover, A.K. "continued to have phone calls with [K.J.] while he was in jail stating that she believed in him."

Arian Melissa Chapa interviewed C.L. at CAC on January 29, 2019. A video recording of the interview was entered into evidence and played at the final termination hearing. In the interview, C.L. reported that K.J. "sexually abused me. . . . He touched me in places that I didn't like. And he threatened me that he would hurt my mom and my baby sister [M.J.] if I told anybody." C.L. stated he did this "more than once" and it went on "for three years." The last time it happened was "a couple of days" before C.L. moved in with her maternal grandmother in June of 2019. C.L. stated that, when she lived with appellants at L.J.'s house, K.J. "woke me up in the middle of the night and grabbed me and threw me on the bed . . . he pulled down his pants and he touched me in places I didn't like." She clarified that K.J. had touched her genital areas with his hand and touched her inside her body. Her mother and sister were sleeping at the time. C.L. reported that, another time at L.J.'s house, K.J. "blindfolded" her and used his "private part" to touch her. She said the abuse happened about twice every couple of weeks.

C.L. explained that, before she moved in with her grandmother, she lived with appellants at L.J.'s house, where they sometimes would not have food and would "go to bed hungry." She said both appellants would smoke marijuana inside L.J.'s house and sometimes in front of her. She said K.J. "has a drinking problem" and "gets drunk almost every night." When he drinks, he "would start yelling" and "would get mad at my mom for no reason." C.L. recalled one time, when K.J. was drinking, M.J. wound up with bruises on her "bottom" and on her legs because K.J. would "throw her down in her walker . . . . he would get so mad at her." When K.J. got mad at A.K., he would "kick us out of the house,

4

even though it wasn't his house." One time, K.J. became angry and was "throwing glass bowls [and] silverware" at A.K. and the children. C.L. said that both she and her mother suffered bruises due to K.J.'s violence. She felt that M.J. was not safe with appellants.

At the termination hearing, A.K.'s counsel cross-examined Chapa on why C.L. would give "little to no detail" about specific instances of sexual abuse. Chapa replied:

> So this child was definitely in something called script memory. So when somebody has been continuously sexually abused, whatever type of abuse it is, all the events start to run together, so that would be consistent with somebody who has been continuously abused versus like where it is a one time incident and they can relay the full details. This just happened so much that it just became one big thing.

When asked by the attorney ad litem whether she saw "factors that would contribute to a delayed outcry" by C.L., Chapa stated:

> Well, she was threatened by [K.J.] to not tell or her mom and sister would be hurt. So that played a huge role. At the end, she talks about not feeling safe. So kids that don't feel safe don't want to tell. When she went back to go—when she went to go live with her grandmother she said she felt safe and they were able to discuss what happened.

Chapa testified she did not see any indication that C.L. was coached or being deceptive. She did not know why K.J. had not been convicted.

Department caseworker Valerie Moretich testified that appellants were each ordered to comply with a service plan. *See* TEX. FAM. CODE ANN. § 263.101. A.K. participated in individual counseling as required by her service plan. A.K. was "pretty consistent" with visitation, though she did miss "one to two" visits without giving any reason. Her interactions with the child were appropriate, and M.J. exhibited a "close bond" with A.K.

The service plan also required A.K. to maintain gainful employment. According to Moretich, A.K. "held several jobs" and "worked odd jobs here and there" but never

5

provided proof of employment during the course of the case. Moretich stated that, under the service plan, A.K.'s "home environment" must be monitored by the Department, but she was not able to observe where A.K. was living. At the beginning of the case, Moretich helped A.K. find a homeless shelter in Corpus Christi, where A.K. stayed for about three months. Later, A.K. provided a home address, but when Moretich went to the address and knocked on the door, no one answered; a man later came out of the building and denied that A.K. lived there. A.K. later provided Moretich with a second address but Moretich said there was no home located there.

Moretich stated that the service plan required A.K. to undergo random drug testing. Moretich asked A.K. "many times" to submit to drug testing but A.K. did not do so during the time Moretich served as the caseworker.[3] Moretich conceded that A.K. did undergo drug testing once for the Department during the pendency of the case, and the results were negative. Moretich also testified that A.K. was "adamant that she was no longer in a relationship with [K.J.] and would never be in a relationship with him again." But Moretich believed that A.K. maintained a romantic relationship with K.J. during the time she was assigned to the case. According to Moretich, A.K. gave conflicting answers as to whether she believed the abuse allegations against K.J.

As to K.J., Moretich stated that he scheduled counseling appointments, as required by his service plan, but he did not show up to the appointments. Once he was released from jail on bond, K.J. expressed interest in starting visitation with M.J., but Moretich discovered that his bond restrictions forbade him from having any contact with the child.

---

[3] When asked if A.K. gave any reason for not undergoing drug testing, Moretich stated: "[At o]ne of the court[] hearings she said that she felt like she was being treated like a criminal and that was part of the reason she did not drug test."

Moretich could not recall whether she asked K.J. to submit to drug testing. She did not have an opportunity to monitor K.J.'s home environment. She said that, in June 2019, K.J. advised her he was living with his mother; however, L.J. said that K.J. "had not been there for about a month and a half." L.J. did not know where K.J. was living, and K.J. never provided a home address to Moretich.

Moretich stated that the Department did a home study on L.J. but "it did not pass" for the following reasons:

> There were concerns about [L.J.] not believing [C.L.]. There were also concerns that because [C.L.] had made the outcry of domestic violence in [L.J.]'s home and that they were made—the family was made to sleep outside while in her home and she did not step in to protect them, the Department was unsure that she would be able to protect [M.J.] while she was there and because of the bond restrictions that [K.J.] had and so we were unsure she would be protective of [M.J.] if she were to be placed there. She also had—she was harboring a runaway at one point and so that was on her criminal record for harboring a runaway, and I think that those were all the reasons.

During Moretich's time as caseworker, M.J. was first placed in a foster home in Ingleside and then, because those foster parents "were just unable to handle her behaviors," the child was placed in another foster home in Corpus Christi. Moretich said that M.J. "would get upset very easily about little things" and had a "speech delay" but "progressed really quickly with her services through ECI [Early Childhood Intervention]" and was making "great progress" in the Corpus Christi foster home.

Sofia Ybarra, who succeeded Moretich as the Department's caseworker, testified that A.K. reported that she was living with a friend but never provided an apartment name or exact address. She did not provide any proof of employment. On April 1, A.K. told Ybarra that she was "with [K.J.]," though she did not specify that she was in a romantic relationship with him. Ybarra asked A.K. to submit to drug testing, but A.K. has not done

so. However, with the exception of "a couple" of missed visits, A.K. has maintained regular visitation with M.J.

According to Ybarra, A.K. "felt like" the allegations of sexual abuse against K.J. were not true because K.J. had not been charged with a crime with respect to those allegations.[4] Ybarra was concerned that A.K. would not be protective of M.J. because she did not believe C.L.'s allegations.

Ybarra stated that M.J. "is very sensitive to change" and "started regressing a little bit" because of the "changes" resulting from the COVID-19 pandemic; for example, the visits with her mother were no longer face-to-face. However, Ybarra did not have any concerns about M.J.'s current foster placement, and she believed the foster parents "are able to meet all of her needs."

Ybarra testified that, to her knowledge, K.J. did not complete or initiate any domestic violence counseling. She asked K.J. to submit to drug testing but he did not do so. She attempted to examine K.J.'s home environment at L.J.'s residence, but when she knocked, "[n]obody came." She opined that it was in M.J.'s best interest for both appellants' rights to be terminated because "[t]here is no home for the child to go home to." Ybarra stated that the current foster parents are willing to adopt M.J. and plan to do so, though she did not know "what the process is" for that to happen. On cross-examination, she stated that merely making the Department M.J.'s permanent managing conservator, without termination of parental rights, was not in M.J.'s best interest because "that's not permanency."

M.J.'s foster mother, Jessica Prothro, testified that she and her husband have

---

[4] One month before the final hearing, K.J. advised Ybarra that he had not been indicted.

cared for the child for just over a year. She said that, including M.J., they have had seven foster children, and they also have two biological children. Prothro said she and her husband are licensed to adopt, a home study has been completed, and "we are ready to go" on adoption.

Prothro said that M.J. had some "pretty significant" behavioral issues when she first came into her care, which she said is normal for a foster child. Because the issues continued for over six months, Prothro enrolled M.J. in ECI programs for "speech and specialized skills therapy" as well as play therapy. According to Prothro, M.J. "improved so rapidly that they decided to graduate her after two months," and the child is now developmentally on track for her age. Still, Prothro testified that M.J. is "food obsessive"; becomes upset "over seemingly small things"; has "sleep issues which we are seeking medical attention for"; and has a "significant" "fear of men."

A.K. testified that she does not believe C.L.'s allegations of abuse because "I see so many things in the video that don't seem like [C.L.]." She agreed that she would only believe an outcry if her daughter "said it to [her] face." She denied that she was in a romantic relationship with K.J. at the time of the final hearing, and she denied that she desires or plans to be in relationship with him in the future. However, she conceded that she told Ybarra on April 1 that she was "trying to be together" with K.J. When asked where she was residing, A.K. replied: "I stay with my where I can [sic]. I thought I had a place and it did not go through. . . . I am on a housing list. I'm trying."

A.K. conceded that she did not complete everything on her service plan, but she did attend counseling, a parenting class, and visits. She stated she was unaware that the court ordered her to undergo drug testing. She later acknowledged that she did not

undergo drug testing through the Department because she was using marijuana at the time.

As to both parents, the trial court found predicate grounds for termination under parts (E) and (O) of family code § 161.001(b)(1). *See id.* § 161.001(b)(1)(E), (O).[5] It also found that termination of both parents' rights was in M.J.'s best interests. *See id.* § 161.001(b)(2). The final order named the Department as M.J.'s permanent managing conservator. *See id.* § 153.371. This appeal followed.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982);

---

[5] The relevant parts of § 161.001(b)(1) authorize termination if a parent:

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [or]

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(b)(1).

*In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

In reviewing the legal sufficiency of the evidence supporting termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005); *In re L.J.N.*, 329 S.W.3d at 671. We must assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so, and we must disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

When reviewing the factual sufficiency of the evidence supporting termination, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire

11

record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1); and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *In re J.L.,* 163 S.W.3d at 84.

### III. ANALYSIS

### A. Predicate Grounds

### 1. Failure to Comply With Court Order

By her second issue on appeal, which we address first, A.K. argues there was insufficient evidence to support predicate grounds for termination under part (O) of § 161.001(b)(1).[6] To establish grounds for termination under part (O), the Department had to establish by clear and convincing evidence that A.K.

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(b)(1)(O). The record reflects that the service plans instituted for appellants in this case were approved by the trial court and adopted as orders of the court, and there is no dispute that the orders are of the type specified in part (O). *See id.*

---

[6] K.J. does not argue that the evidence is insufficient to support this ground.

12

The burden of complying with the court order is on the parent. *In re S.J.R.-Z.*, 537 S.W.3d 677, 690 (Tex. App.—San Antonio 2017, pet. denied). Part (O) does not provide a means of evaluating partial or substantial compliance with a plan, and it does not "make a provision for excuses" for the parent's failure to comply with the service plan. *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.); *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Therefore, "substantial compliance is not enough to avoid a termination finding" under this statute. *In re C.M.C.*, 273 S.W.3d 862, 875 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The Department need only establish the parent's failure to comply fully with a court order—it need not establish any particular quantity of failure or degree of compliance. *See In re S.J.R.-Z.*, 537 S.W.3d at 690; *In re I.G.*, 383 S.W.3d 763, 771 (Tex. App.—Amarillo 2012, no pet.).

Caseworkers Moretich and Ybarra testified that A.K. completed some of the tasks in the service plan, including participating in individual counseling and attending supervised visits with the child. A.K. testified she also attended a parenting class. However, both caseworkers stated that, on multiple occasions, A.K. failed to undergo drug testing as they requested, though she did test negative once.[7] A.K. conceded that she declined to drug test because she was using marijuana. The caseworkers further related that A.K. failed to provide any proof of gainful employment, also contrary to the

---

[7] A.K. argues in her brief that the copy of the service plan entered into evidence and included in the appellate record is "almost entirely illegible" and does not show that A.K. was required to undergo drug testing at the Department's request. However, Moretich testified that the service plan required A.K. to undergo random drug testing, and there was no testimony adduced to the contrary. In any event, the appellate record contains a corrected exhibit volume which includes a legible copy of A.K.'s service plan, and it states in relevant part:

> The [Department] Caseworker will advise [A.K.] to submit to random drug testing (oral swab, urine analysis, and/or hair follicle) at the discretion of the Department. All drug tests shall produce a negative result. [A.K.] understands that any drug test she fails to attend results in an assumed positive drug test.

13

requirements of the service plan.[8] Finally, except for a period of about three months when A.K. lived in a homeless shelter, she did not provide the caseworkers with any home address which could be verified. A.K. gave two supposed home addresses to Moretich, but Moretich's investigation revealed that A.K. did not live at either address. A.K. told Ybarra that she was living with a friend, but she did not provide any address or apartment name. As a result of A.K.'s failure to provide a verifiable home address, the caseworkers were not able to monitor her home environment as required by the service plan.[9]

Viewing the evidence in the light most favorable to the Department, we conclude a reasonable trier of fact could have formed a firm belief or conviction that A.K. failed to comply with a court order under § 161.001(b)(1)(O). *See In re J.L.*, 163 S.W.3d at 85. And considering the entire record, we conclude the contrary evidence was not so significant as to preclude such a finding. *In re J.F.C.*, 96 S.W.3d at 266. A.K.'s second issue is overruled.

### 2. Endangerment

Appellants each argue by their first issue on appeal that the evidence was

---

[8] A.K.'s service plan states in relevant part:

The [Department] Caseworker will inform [A.K.] that she will obtain and maintain gainful employment in order to show the Department that she is able to meet the basic needs of [M.J.].

The [Department] Caseworker will inform [A.K.] she must provide the Department with the name and address of employment, as well as provide verification of employment through pay stubs or letters from the employer.

[9] A.K.'s service plan states in relevant part:

The [Department] Caseworker will monitor the home environment of [A.K.] monthly.

[A.K.] will need to provide a safe and protective home for her child. The home should be sanitary, free of any hazards, and have all working utilities (electricity, water, gas, etc.), with access to a telephone for emergency purposes. The [Department] Caseworker will advise [A.K.] to provide proof of housing and working utilities (paid receipts) to the [Department] Caseworker.

insufficient to support predicate grounds for termination under § 161.001(b)(1)(E).[10] Under that part of the statute, the Department must have shown by clear and convincing evidence that each appellant "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

"Endanger" means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.*; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Danger to a child need not be established as an independent proposition and may be inferred from parental misconduct. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *Id.* Termination under part (E) "requires a voluntary, deliberate, and conscious course of conduct by the parent" and must be based on more than a single act

---

[10] "To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *see* TEX. FAM. CODE ANN. § 161.001(b)(1); *see also* TEX. R. APP. P. 47.1. However, the sufficiency of the evidence supporting a finding of endangerment under § 161.001(b)(1)(D) or (E) must be reviewed when challenged, regardless of whether the evidence supporting termination under another statutory ground is sufficient. *In re N.G.*, 577 S.W.3d at 234, 237 (holding that "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights" on endangerment grounds because an endangerment finding "becomes a basis to terminate that parent's rights to other children" under part (M)); *see In re L.G.*, 596 S.W.3d 778, 781 (Tex. 2020) (per curiam); *In re C.W.*, 586 S.W.3d 405, 507 (Tex. 2019) (per curiam); *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019) (per curiam). Accordingly, even though we have already found the evidence sufficient to support termination of A.K.'s parental rights under part (O) and K.J. does not dispute the sufficiency of the evidence to support termination under part (O), we must still review the sufficiency of the evidence supporting the endangerment findings under part (E).

or omission. *See In re P.W.*, 579 S.W.3d 713, 726 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 818 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The primary evidence of endangerment came from C.L.'s interview at CAC, in which the child explained that K.J. had regularly sexually abused her "for three years." At one point, K.J. "blindfolded" C.L. and used his "private part" to touch her. C.L. further stated that K.J. had an alcohol problem and would become angry and violent when he was drunk. C.L. related that K.J. once caused M.J. to suffer bruises when he was mad at her and "thr[e]w her down in her walker." This evidence was sufficient to allow a reasonable trier of fact to form a firm belief or conviction that K.J. engaged in a course of conduct which endangered M.J.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *In re J.L.*, 163 S.W.3d at 85. Further, in light of the entire record, there was no contrary evidence so significant as to preclude the court from making such a finding. *See In re J.F.C.*, 96 S.W.3d at 266.

On the other hand, there is no allegation or evidence that A.K. personally harmed, abused, or physically mistreated M.J. or any other child. As far as physical violence is concerned, the only allegation against A.K. is that she intentionally moved back in to live with L.J. after having already agreed in the safety plan that she would not allow M.J. to have contact with K.J. But the safety plan also provided that L.J. would not permit K.J. to live in her residence, and there was no evidence adduced indicating that A.K. actually knew K.J. had returned to live with L.J. at the time she decided to move back in with the child. Thus, we cannot say, based on this evidence alone, that A.K. "knowingly" placed M.J. with K.J. so as to support an endangerment finding. *See* Tex. Fam. Code Ann.

16

§ 161.001(b)(1)(E).

That said, C.L. stated in her CAC interview that both appellants used marijuana and occasionally did so in her presence. A.K. failed to submit to random drug testing during the pendency of the case, and she acknowledged that this was because she was using marijuana. Persistent illegal drug use may support a finding of an endangering course of conduct under part (E). *See In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.); *Walker*, 312 S.W.3d at 617 (reasoning that a parent's illegal drug use may support termination under part (E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned"). Further, A.K. demonstrated an inability to maintain stable housing or employment. She did not provide the caseworkers with proof of employment or a verifiable residence. Instead, as the caseworkers testified, she was reliant on L.J. for shelter, and C.L. stated that the children would sometimes "go to bed hungry" when they and appellants lived with L.J.

A.K. argues that an endangerment finding under part (E) may not be based solely on failure to maintain stable housing. *See In re J.R.*, 171 S.W.3d 558, 578 (Tex. App.—Houston [14th Dist.] 2005, no pet.). That may be true; however, a failure to provide stable housing can support an endangerment finding under (E) when "combined with failure to provide for the children's needs." *Id.* Here, though the evidence was not overwhelming, we find that it was sufficient to support a firm belief or conviction that A.K. engaged in a course of conduct which endangered M.J.'s physical or emotional well-being, and the contrary evidence was not so significant as to preclude such a finding. *See In re J.F.C.*, 96 S.W.3d at 266.

Appellants' first issues are overruled.

**B. Best Interests**

A.K. argues by her third issue, and K.J. by his second issue, that the evidence was insufficient to support the trial court's findings that termination of their parental rights was in M.J.'s best interests.

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Factors that we consider in determining whether termination of parental rights is in a child's best interest include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all nine *Holley* factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 25, 27.

As to the first *Holley* factor, M.J. was under three years old at the time of the termination hearing and is therefore too young to express her desires. *See In re R.S.D.*, 446 S.W.3d 816, 818, 820 (Tex. App.—San Antonio 2014, no pet.) (finding that the child, who was "almost four years old" at the time of trial, was "too young to have stated his desires").

18

As to the second factor, Fisher stated that M.J. is "non-verbal" which "is a safety concern" because it means the child would not be able to communicate if something bad happened. Moretich stated that M.J. had a speech delay, and that the foster family she was initially placed with was "unable to handle her behaviors," but that M.J. has improved while in her current placement. M.J.'s foster mother testified that the child had "significant" behavioral issues when she came into her care and these issues continued for over six months. M.J. improved after undergoing therapy but still is "obsessive" about food, becomes easily upset, has "sleep issues," and has a "significant" "fear of men." Because M.J. has emotional and physical needs beyond that of a typical child her age, this factor weighs in favor of termination.

Consideration of the third and eighth *Holley* factors also weighs in favor of termination, especially with respect to K.J. Although K.J. has not been formally charged with a crime related to his treatment of C.L., the statements by C.L. in her CAC interview support a finding that K.J. presents a substantial and serious risk of emotional and physical danger to children, including M.J. Importantly, Fisher stated A.K. is "dependent" on K.J.'s mother L.J. for housing, and A.K. conceded that she told Ybarra that she was "trying to be together" with K.J. even after the abuse allegations were known and the safety plan was put in place. A.K. was clear that she did not believe the allegations against K.J. Accordingly, even though A.K. did not personally abuse any child, the evidence supported a finding that the danger to M.J. caused by K.J. would persist if A.K.'s parental rights were not terminated.

As to the fourth and fifth *Holley* factors, K.J. failed to initiate domestic violence counseling and did not visit with the child because his bond conditions prohibited it.

19

Contrariwise, A.K. attended individual counseling and completed a parenting class, participated in most scheduled visits with M.J., and exhibited a "close bond" with the child during those visits. Consideration of these factors weighs in favor of termination of K.J.'s parental rights and against termination of A.K.'s rights.

As to the sixth and seventh *Holley* factors, both appellants exhibited an inability to maintain stability in housing or employment. On the other hand, Ybarra testified that M.J.'s current foster parents "are able to meet all of her needs," and the foster mother stated that she and her husband have several foster children and are prepared to adopt M.J. A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *see In re R.S.-T.*, 522 S.W.3d 92, 113 (Tex. App.—San Antonio 2017, no pet.). A factfinder may consider the consequences of failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur, rather than the impermanent foster-care arrangement that would result in the absence of termination. *See In re K.C.*, 219 S.W.3d at 931.

Considering all the *Holley* factors, we conclude that the evidence was legally and factually sufficient to rebut the strong presumption that keeping M.J. with her biological parents is in her best interest. *See* TEX. FAM. CODE ANN. § 153.131; *In re R.R.*, 209 S.W.3d at 116. Instead, a reasonable trier of fact could have formed a firm belief or conviction that termination of appellants' parental rights was in M.J.'s best interests, and the contrary evidence was not so significant as to preclude such findings. *See In re J.L.*, 163 S.W.3d

20

at 85; *In re J.F.C.*, 96 S.W.3d at 266. We overrule A.K.'s third issue and K.J.'s second issue.

## IV. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed the
18th day of November, 2020.